**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

| | |
|---|---|
| TJM 64, INC.; T.J. MULLIGANS, INC.; RAB MEMPHIS, LLC; HADLEY'S PUB, INC.; TAVERN 018, INC.; BREWSKI'S SPORTS BAR AND GRILLE, LLC; MURPHY'S PUBLIC HOUSE, INC.; and CANVAS OF MEMPHIS, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> SHELBY COUNTY MAYOR, LEE HARRIS; SHELBY COUNTY HEALTH DEPARTMENT DIRECTOR, ALISA HAUSHALTER; and SHELBY COUNTY HEALTH OFFICER, BRUCE RANDOLPH, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) Case No. 2:20-cv-02498-JPM-tmp |

**ORDER DENYING APPLICATION FOR TEMPORARY RESTRAINING ORDER**

This substantive due process and takings case is before the Court on Plaintiffs TJM 64, Inc., T.J. Mulligans, Inc., RAB Memphis, LLC, Hadley's Pub, Inc., Tavern 018, Inc., Brewski's Sports Bar and Grille, LLC, Murphy's Public House, Inc., and Canvas of Memphis, LLC's (hereinafter collectively "Plaintiffs") First Motion for Temporary Restraining Order ("TRO"), filed on July 15, 2020.  (ECF No. 10.)  Plaintiffs move the Court pursuant to Federal Rule of Civil Procedure 65 for a TRO preventing Defendants Shelby County Mayor Lee Harris, Shelby County Health Department Director Alisa Haushalter, and Shelby County Health Officer Bruce Randolph (referred to hereinafter as "Defendants" or "Shelby County")

from enforcing the July 8, 2020 COVID-19 Closure Order issued by Defendants, which required the closure of Plaintiffs' bars and limited service restaurants. (See ECF No. 10.)

Defendants filed their Response on July 19, 2020. (ECF No. 16.) Defendants argue that "Plaintiffs fail to state a claim upon which relief can be granted . . . and do not meet the standard necessary for the issuance of a TRO." (Id. at PageID 78.) Defendants also attached Executive Order No. 38 issued by the Governor of Tennessee to their Response. (ECF No. 16-1.) Plaintiffs filed a Reply Brief on July 24, 2020. (ECF No. 18.)

The Court held a video hearing on the Motion on July 27, 2020. Counsel for both Plaintiffs and Defendants were present. The Court heard testimony from the following individuals: Lee Thomas Adams, owner of TJM64, Inc., T.J. Mulligan's, Inc., and RAB Memphis, LLC; Tiffany Michelle Brewer, owner of Brewski's Sports Bar and Grille, LLC; Robert Coletta, owner of Canvas of Memphis, LLC; Richard Hale, Jr., owner of Hadley's Pub, Inc.; Mike Nash, owner of Tavern 018, Inc.; Alisa Haushalter, Director of Shelby County Health Department; and David Allen Sweat, Deputy Director of the Shelby County Health Department & Epidemiology. (See Witness and Exs. List, ECF No. 21.) During the Hearing, Defendant also raised its Motion for Judgment as a Matter of Law under Federal Rule of Civil Procedure 50.

For the reasons set forth below, Plaintiffs' Motion for a TRO is **DENIED**.

## I. BACKGROUND

This action was filed on July 13, 2020. (ECF No. 1.) Plaintiffs are the owners of several establishments licensed as limited service restaurants in Shelby County, Tennessee. (Id. ¶¶ 19–20.) On July 8, 2020, the Shelby County Health Department issued an order

2

requiring all "Bars/Limited Service Restaurants and Clubs" to shut down for forty-five days because of a spike in COVID-19 cases in Shelby County, TN.  (Id. ¶¶ 15–16.)  The Order allowed all other businesses to remain open, except (1) "Bars/Limited Service Restaurants and Clubs," (2) "Adult Entertainment venues," (3) schools, and (4) "[f]estivals, fairs, parades, large scale sporting events, and large-scale community events."  (Id. ¶ 17.)  According to local regulation, a "Limited Service Restaurant" is a facility that "must not have total gross receipts of prepared foods in excess of 50% of their overall sales."  (Id. ¶ 18.)  Plaintiffs allege that the July 8, 2020 Closure Order is an "Indefinite Closure" of Plaintiffs' businesses.  (Id. ¶ 22.)

According to the Complaint, not all facilities that sell primarily alcohol have been required to close.  (Id. ¶ 21.)  Plaintiffs allege that bars, pubs, and restaurants on Beale Street and other "heavily trafficked 'tourist' areas of Memphis and Shelby County were untouched by the Order."  (Id.)

Plaintiffs assert two constitutional violations: (1) the July 8, 2020 COVID-19 Closure Order (also known as Shelby County Health Directive 8) violates the Takings Clause of the Fifth Amendment, as a regulatory taking; and (2) the Order violates substantive due process under the Fourteenth Amendment.  (Id. at PageID 5, 10.)  Plaintiffs assert that the COVID-19 Closure Order "prohibits *all* economically beneficial and profitable uses of the Plaintiffs' Tangible Property and Physical Location[,] [and that] [t]he entirety of the Plaintiffs' property rights have been extinguished."  (Id. ¶ 33.)  Plaintiffs allege that the Order "indiscriminately chose[] a small group of restaurant/bar owners whose businesses are predominately outside the curtilage of Memphis and Shelby County tourism centers."  (Id. ¶ 34.)  Plaintiffs assert that the Order qualifies as a categorical taking under Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 1019 (1992), and, alternatively, qualifies as a regulatory taking under the

3

framework established by Penn Central Transportation Co. v. New York City, 438 U.S. 104 (1978).  (Id. ¶¶ 37–45.)

Plaintiffs' substantive due process challenge alleges that the COVID-19 Closure Order is "capricious, irrational, arbitrary and abusive conduct which unlawfully interferes with the Plaintiffs' liberty interests protected by the due process clause of the Fourteenth Amendment . . . ."  (Id. ¶ 51.)  Plaintiff appears to assert that the Defendants' Order shocks the conscience and violates the Fourteenth Amendment's protections against arbitrary and capricious government action.  (See id. ¶¶ 51–58.)

Plaintiffs seek compensatory damages for the allegedly unlawful takings and for the violation of Plaintiffs' substantive due process rights, a declaratory judgment finding the COVID-19 Closure Order unconstitutional in violation of the Fifth and Fourteenth Amendments of the Constitution, a permanent injunction preventing Defendants from enforcing the Order until a mechanism is put in place to provide Plaintiffs compensation for their forced closures, and attorney's fees.  (Id. at PageID 12–13, Prayer for Relief, ¶¶ 1–6.)

On July 24, 2020, the Shelby County Health Department also issued an updated COVID-19 Closure Order, entitled Shelby County Health Department Directive 9.[1]  (See Hr'g Ex. 13.)  Directive 9 applies to Plaintiffs in the same manner as the July 8, 2020 COVID-19 Closure Order, but additionally imposes restrictions on some full-service restaurants.  (See id.)

---

[1] For purposes of this Order, the Court will refer to the Order referenced in Plaintiff's Complaint, the July 8, 2020 Closure Order.  The Court's reasoning and analysis applies equally to the subsequent July 24, 2020 Order, as the Order is virtually identical in the way it impacts Plaintiffs.

## II. LEGAL STANDARD

A TRO is an "extraordinary remedy 'designed to preserve the relative positions of the parties until a trial on the merits can be held.'" Thomas v. Schroer, 116 F. Supp. 3d 869, 874 (W.D. Tenn. 2015) (quoting Tenn. Scrap Recyclers Ass'n v. Bredesen, 556 F.3d 442, 447 (6th Cir. 2009)); see also Univ. of Texas v. Camenisch, 451 U.S. 390, 395 (1981) ("The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held.")  In deciding whether to issue a TRO, the Court considers four factors: (1) "whether the movant has shown a strong likelihood of success on the merits"; (2) "whether the movant will suffer irreparable harm if the injunction is not issued"; (3) "whether the issuance of the injunction would cause substantial harm to others"; and (4) "whether the public interest would be served by issuing the injunction."  Overstreet v. Lexington-Fayette Urban Cty. Gov't, 305 F.3d 566, 573 (6th Cir. 2002) (citing Leary v. Daeschner, 228 F.3d 729, 736 (6th Cir. 2000)).  "These factors are not prerequisites, but are factors that are to be balanced against each other."  Id. (citing United Food & Comm. Workers Union, Local 1099 v. Sw Ohio Reg'l Transit Auth., 163 F.3d 341, 347 (6th Cir. 1998)).  The moving party bears the burden of proving the necessity of a TRO.  Thomas, 116 F. Supp. 3d at 874 (citing Stenberg v. Cheker Oil Co., 573 F.2d 921, 925 (6th Cir. 1978)).  The district court should only grant the request for a TRO if the "movant carriers his or her burden of proving that the circumstances clearly demand it."  Id. (citing Leary, 228 F.3d at 739).

## III. ANALYSIS

*A. Likelihood of Success on the Merits*

*1. Fourteenth Amendment Substantive Due Process*

5

Plaintiffs, as stated supra, allege that Defendants' July 8, 2020 COVID-19 Closure Order constitutes arbitrary and capricious government conduct. See supra Sec. II.  The global COVID-19 pandemic warrants special consideration.  It is well settled that "a community has the right to protect itself against an epidemic of disease which threatens the safety of its members." Jacobson v. Massachusetts, 197 U.S. 11, 27 (1905).  "All agree that the police power retained by the states empowers state officials to address pandemics such as COVID-19 largely without interference from the courts." League of Ind. Fitness Facilities and Trainers, Inc. v. Whitmer, No. 20-1581, 2020 WL 3468281, at *2 (6th Cir. June 24, 2020) (citing Jacobson, 197 U.S. at 29) (unpublished).  Courts from across the country have reaffirmed the historical principle that states and municipalities are granted broad powers to combat the spread of dangerous communicable diseases.  See S. Bay Un. Pentecostal Church v. Newsom, --- U.S. ----, 140 S. Ct. 1613, 1613 (May 29, 2020) (Mem.) (Roberts, C.J., concurring) (noting that "[the State's] latitude must be especially broad" to combat the COVID-19 pandemic); see also Whitmer, 2020 WL 3468281, at *2 (collecting cases addressing the states' broad police powers to combat the spread of the COVID-19 virus).

The state's power to regulate during a pandemic is not without its limits.  See Maryville Baptist Church, Inc. v. Beshear, 957 F.3d 610, 615 (6th Cir. 2020).  The standard of review applicable to a state or local government's promulgation of a public health related closure order depends on the right allegedly infringed upon by the order.  See Whitmer, 2020 WL 3468281, at *1 ("Some [COVID-19 orders] involve individual rights for which precedent requires courts to apply a heightened level of scrutiny . . . ."); compare Beshear, 957 F.3d at 614–15 (applying strict scrutiny to order infringing on free exercise of religion), with, Tex.

Democratic Party v. Abbott, 961 F.3d 389 (5th Cir. 2020) (applying rational basis review to a voting restriction case where the "plaintiffs' fundamental right is not at issue").

Plaintiffs assert a Fourteenth Amendment challenge on the grounds that the Shelby County Government's actions are arbitrary and capricious. The Court is required to apply a deferential standard, looking to whether the Defendants' action in adopting their COVID-19 Order was undertaken in an "arbitrary, unreasonable manner," or through "arbitrary and oppressive regulations[.]" Local Spot, Inc. v. Lee, No. 3:20-cv-00421, 2020 WL 3972747, at *2 (M.D. Tenn. July 14, 2020). A law involving public health emergencies will only be struck down if it has "no real or substantial relation to those objects, or is beyond all question, a plain, palpable invasion of rights secured by the fundamental law." Jacobson, 197 U.S. at 31; see also Whitmer, 2020 WL 3468281, at *1 (noting that many actions challenging COVID-19 closures orders "involve executive actions that, by precedent, are viewed only through the lens of a very modest, or 'rational basis,' standard of review").

Plaintiffs' substantive due process challenge is unlikely to succeed on the merits. First, given the deferential review applicable to public health orders and based on the record before the Court, Shelby County's decision to close certain bars and restaurants is not "arbitrary and capricious" or "unreasonable." Defendants weighed the risks posed by increasing numbers of COVID-19 cases in Shelby County against the risks posed to businesses. Defendants' actions reflect a concerted effort to respond reasonably to a pressing health crisis. The distinction made between certain restaurants and those like Plaintiffs, which only gross less than 50% of their sales from food sales, and those which receive over 50% of their gross revenue from food sales, has a "real or substantial relation" to preventing the spread of COVID-19 within Shelby County. Jacobson, 197 U.S. at 31. Both Defendant

7

Haushalter's and Deputy Director Sweat's testimony indicate that the decision to close bars and limited service restaurants was based on significant input from the Center for Disease Control ("CDC") and CDC public health Rear Admiral Jonathan Mermin. Rear Admiral Mermin led a crisis response team deployed to Memphis to provide guidance and assistance to Shelby County in formulating the Health Department's response to increasing COVID-19 cases including the Department's July 8, 2020 Closure Order.

The 50% food sales cut-off is used by Tennessee law to differentiate between "limited service restaurants" and other restaurants for purposes of health licensures. See Tenn. Code Ann. § 57-4-102(22)(A)(iii). The Tennessee Code does not provide for the licensure of "bars." (ECF No. 16 at PageID 81.)

Defendants have provided testimony from Director Haushaulter and Deputy Director Sweat that limited service restaurants[2] pose a greater risk for the spread of the COVID-19 virus than other restaurants. Defendants cite literature from the California Health Department to support their position that "[b]ars present unique risks and challenges (greater and different than the risks posed in other types of restaurants or service venues) to the Health Department and the community in attempting to contain the spread of the disease." (Id. at PageID 79.) Taken together, Defendants have demonstrated that using the 50% food sales mark as a rubric for closing bars is not arbitrary and capricious but is reasonably related to the legitimate government goal of combatting the spread of the COVID-19 virus in Shelby County.

Under Tennessee law, the 50% criterion does not apply to certain bars and restaurants located in historic districts, such as the Beale Street historic district. See Tenn. Code Ann.

---

[2] The terms "limited service restaurants" and "bars" may be used interchangeably.

8

§ 57-4-102(30)(C)(i). (See ECF No. 16 at PageID 81–82.) Those exempted businesses are licensed as restaurants under Tennessee health regulations, regardless of whether they exceed the 50% criterion distinguishing restaurants from limited service restaurants. See id. Plaintiffs argue that this distinction between Beale Street bars and restaurants and their bars and limited service restaurants is arbitrary and capricious. Defendants have provided practical justifications for relying on this distinction. Defendants contend that it would be "impractical" to assess on a case-by-case basis whether bars or restaurants, including those listed as restaurants for purposes of state licensing on Beale Street, would meet the 50% threshold:

> [Such a measure] would require the [Shelby County] Health Department to expend its limited resources in the middle of a global pandemic to audit businesses to determine whether the bulk of their sales are alcohol-related, to conduct on-site inspections of the businesses to determine whether their physical layouts and menus are consistent with some definition of a 'bar,' and to revisit those sites on a routine basis to check for changes.

(Id. at PageID 82.) The testimony of Director Haushaulter and Deputy Director Sweat demonstrates that Plaintiffs' suggested bar-by-bar, restaurant-by-restaurant evaluation would be overly burdensome on a Shelby County Health Department that has deployed all of its resources to combat the coronavirus.

The role of the Court is not to second guess whether Defendants made the right decision in using this 50% food sales distinction. The Court's role is to determine whether Defendants' decision is reasonably related to the legitimate government goal of fighting the COVID-19 virus. See Whitmer, 2020 WL 3468281, at *3 ("[T]he Governor's order need not be the most effective or least restrictive measure possible to attempt to stem the spread of COVID-19. Shaping the precise contours of public health measures entails difficult line-

9

drawing. Our Constitution wisely leaves that task to officials directly accountable to the people." (internal citations omitted)). Shelby County's Order is reasonably related to the legitimate government goal of fighting the COVID-19 virus.

Finally, although Plaintiffs argued at the Hearing that no scientific studies or data backed Defendants' decisions, the Fourteenth Amendment's arbitrary and capricious standard does not require such data-driven, scientifically rigorous decision-making from local officials. See Whitmer, 2020 WL 3468281, at *3 ("Whether the Governor's Order is unsupported by evidence or empirical data in the record does not undermine her decision, at least as a legal matter." (internal quotation marks omitted)). Instead, the Constitution only requires that Defendants' decisions be based on "'rational speculation' that offers 'conceivable support' for the [Defendants'] order." Id. (quoting FCC v. Beach Commc'ns, Inc., 508 U.S. 307, 313–15 (1993)). In the instant case, Defendants based their decision on the "rational speculation" that the activities generally associated with "limited service restaurants" pose a significant and unique risk of spreading the COVID-19 virus among the community, a "rational speculation" shared by health officials from the CDC. The testimony was that the consumption of alcohol in bars lowers patrons' inhibitions, which makes it more difficult to properly social distance and follow the recommended health guidelines designed to combat the spread of the COVID-19 virus. Additionally, activities traditionally associated with bars, such as karaoke, live music, and other related activities all present a greater risk of spreading the COVID-19 virus. Shelby County's justification for its COVID-19 Closure Order therefore passes constitutional muster.

In summary, Plaintiffs have not shown that they are likely to succeed on the merits on their Fourteenth Amendment substantive due process challenge to the July 8, 2020 COVID-19 Closure Order.  This factor weighs strongly against granting a TRO.

*2. Plaintiffs' Fifth Amendment Takings Clause Claim*

Plaintiffs assert that they are likely to succeed on the merits of their Takings Clause claim.  (See Mem. in Support of Mot. for TRO, ECF No. 10-6 at PageID 62.)  In their Complaint, Plaintiffs assert that the COVID-19 Closure Order is a regulatory taking under either the "total takings" line of cases following Lucas or under the balancing test for regulatory takings under Penn Central.  (Compl., ECF No. 1 ¶¶ 37–45.)

The Fifth Amendment Takings Clause provides that private property shall not "be taken for public use, without just compensation."  U.S. Const. amend. V.  "The purpose of forbidding uncompensated takings of private property for public use is 'to bar Government from forcing some people alone to bear public burdens, which, in all fairness and justice, should be borne by the public as a whole."  Connolly v. Pension Benefit Guar. Corp., 475 U.S. 211, 277 (1986) (quoting Armstrong v. United States, 364 U.S. 40, 49 (1960)).

There are two recognized categories of takings: (1) physical takings and (2) regulatory takings.  See Waste Mgmt. v. Metro Gov't, 130 F.3d 731, 737 (6th Cir. 1997).  Plaintiffs' case does not implicate a physical taking, as the Government has not physically occupied Plaintiffs' limited service restaurants as a result of the July 8, 2019 COVID-19 Closure Order.

There are two lines of cases that discuss where to draw the line between legitimate government regulation and regulatory takings.  One line involves categorical takings, whereby a regulation "deprives an owner of '*all* economically beneficial uses' of his land."  Tenn.

11

Scrap Recyclers Ass'n v. Bredesen, No. 2:08-cv-2073, 2008 WL 6708174, at *9 (W.D. Tenn. June 3, 2008) (quoting Tahoe–Sierra Pres. Council v. Tahoe Reg'l Planning Agency, 535 U.S. 302, 330 (1992)) (emphasis in original).  A categorical taking occurs "in the extraordinary circumstance when *no* productive or economically beneficial use of land is permitted" by the regulation or ordinance.  Lucas, 505 U.S. at 1017 (emphasis in original).

A regulatory taking occurs when the government regulates the use of property and "engages in . . . essentially ad hoc, factual inquiries . . . ."  Tenn. Scrap, 2008 WL 6708174, at *9 (quoting Penn. Cent., 438 U.S. at 124) (internal quotation marks omitted).  The Supreme Court has identified three factors to consider when determining whether a regulatory taking has occurred: "(1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the government action."  Id. (citing Penn. Cent., 438 U.S. at 124).  Although the government has the right to regulate property and property use, a "regulation [that] goes too far . . . will be recognized as a taking."  Id. (citing Penn. Coal Co. v. Mahon, 260 U.S. 393, 414 (1922)).

Plaintiffs are unlikely to succeed on the merits of their claim to the extent they claim that the COVID-19 Closure Order will result in a total loss of their properties' value.  A total loss only occurs if the property has no productive or economically beneficial use.  See Lucas, 505 U.S. at 1017.  Plaintiffs have not shown that their properties have lost *all* economic value.  The Court does not mean to downplay the dire economic situations facing Plaintiffs' businesses.  The testimony of the owners of these businesses indicates that Plaintiffs will likely be out of businesses by August or September.  The owners' testimony also indicates that it would be financially impractical to operate curbside or takeout food and beverage

12

services.  Each owner testified that they would lose money if they offered such services.  That said, their voluntary decision not to pursue other business alternatives such as take-out or delivery options that would comply with the Closure Order prevents them from demonstrating that they have suffered a total loss.  See McCarthy v. Cuomo, No. 20-cv-2124 (ARR), 2020 WL 3286530, at *5 (E.D.N.Y. June 18, 2020).  While it may not accord with Plaintiffs' pre-pandemic financial plans to operate their businesses in ways the Order allows, it does not follow that the Closure Order has necessarily stripped Plaintiffs' businesses of *all* their value.

The Supreme Court has cautioned that a regulation which does not deprive the owners of *all* the economic value in their property must be analyzed under the multi-factor analysis set forth by Penn Central.  See Tahoe–Sierra, 535 U.S. at 302.  The Court therefore turns to the Penn Central multi-factor analysis.  Upon application of these factors, the Court finds that Plaintiffs are unlikely to demonstrate the COVID-19 Closure Order qualifies as a regulatory taking.  Although the first and second Penn Central factors support Plaintiffs, the third factor does not and outweighs the other two factors.

It is undeniable that the COVID-19 Order will have a significant, detrimental impact on the Plaintiffs' businesses.  Each of the Plaintiffs' owners' affidavits demonstrates as much.  (See ECF Nos. 10-1, 10-2, 10-3, 10-4, 10-5.)  The owners of the Plaintiff bars and restaurants testified that the Closure Order jeopardizes the short-term and long-term survival of their businesses.  The value of Plaintiffs' commercial properties rests in their ability to generate profits through on-site alcohol and food sales, which are completely suspended by the COVID-19 Closure Order.  As stated supra, these businesses will likely be out of business in the next two to three months if the Closure Order remains in effect.  Such disastrous economic consequences favor a finding that the Closure Order constitutes a regulatory taking.

Plaintiffs' reasonable investment-backed expectations also support a finding that Defendants' COVID-19 Order qualifies as a regulatory taking. Plaintiffs invested in their businesses and properties for the purpose of owning and operating clubs, restaurants and bars. Most of these restaurants are small neighborhood bars and restaurants that derive their profits from in-person patronage. It is true that in highly regulated industries an owner's investment-backed expectation in their business will be tempered by the possibility of regulatory changes over the years. See Elmsford Apartment Associates, LLC v. Cuomo, No. 20-cv-4062 (CM), 2020 WL 3498456, at *9 (S.D.N.Y. June 29, 2020) ("[R]easonable investment-backed expectations cannot extend to absolute freedom from public program[s] adjusting the benefits and burdens of economic life to promote the common good." (quoting Penn Cent., 438 U.S. at 124) (internal quotation marks omitted)); see also Connolly v. Pension Ben. Guar. Corp., 475 U.S. 211, 227 (1986) ("Those who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end." (quoting FHA v. The Darlington, Inc., 358 U.S. 84, 91 (1958)) (internal quotation marks omitted)).

The COVID-19 Order issued by Defendants is not a "subsequent amendment[] to achieve the legislative end[s]" of health code regulations imposed on bars and restaurants. The COVID-19 Order, and COVID-19 restrictions generally, are about limiting the spread of communicable disease in close quarters. They are unrelated to health restrictions already imposed on restaurants by local and state health codes. The July 8, 2020 and July 24, 2020 Closure Orders therefore interfere in a significant way with Plaintiffs' investment-backed expectations in their properties, despite their status as highly regulated entities.

The character of Defendants' actions and the context in which Defendants find themselves, here facing a national public health emergency, cut strongly against a finding that the COVID-19 Closure Orders amount to regulatory takings.  The Takings Clause does not render every government action a taking just because it has a detrimental effect on the owner's property; the text of the Takings Clause dictates that a regulatory action will only constitute a taking, and thus require just compensation, when the property is being taken for the "public use."  See United States v. Droganes, 728 F.3d 580, 591 (6th Cir. 2013) (noting that the state's seizure of property was an exercise of its "police power" and did "not constitute a 'public use'" (quoting Innovaire Aviation, Ltd. v. United States, 632 F.3d 1336, 1341 (Fed. Cir. 2011))); see also AmeriSource Corp. v. United States, 525 F.3d 1149, 1152 (Fed. Cir. 2008) ("The [Takings] [C]lause does not entitle all aggrieved owners to recompense, only those whose property has been taken for a public use."); Lech v. Jackson, 791 F. App'x 711, 719 (10th Cir. 2019) (agreeing with the Federal Circuit that if a government's exercise of power to rid an individual of property is not pursuant to its power of eminent domain but some other police power, the Takings Clause is not implicated).  As the Supreme Court has reiterated, "[L]and-use regulation does not effect a taking if it 'substantially advance[s] legitimate state interests . . . .'"  Lucas, 505 U.S. at 1024 (quoting Nollan v. California Coastal Comm'n, 438 U.S. 825, 834 (1987)).  Where a state "reasonably conclude[s] that 'the health, safety, morals, or general welfare' would be promoted by prohibiting particular contemplated uses of land," the state is not required to provide just compensation to the citizens affected by the regulation.  Penn Cent., 438 U.S. at 125.

As stated supra, Defendants, in promulgating the July 8, 2020 Order were acting pursuant to their broad police powers to address public health concerns during a national,

15

state, and local pandemic.  See supra Sec. III.A.  Defendants' promulgation of the July 8, 2020 COVID-19 Closure order was not for a "public use" but was instead a valid exercise of the broad police powers bestowed upon state and local officials to prevent detrimental public harms by restricting Plaintiffs' use of their property.  It is unlikely that such action would require compensation under the Takings Clause.

There are also practical reasons supporting this finding.  Labeling Defendants' Order a taking would require the state to compensate *every* individual or property owner whose property use was restricted for the purpose of protecting public health.  This would severely limit the state's especially broad police power in responding to a health emergency.  Constraining such government actions would exceed the scope of the Takings Clause by "transform[ing] [the] principle [that 'all property in this country is held under the implied obligation that the owner's use of it shall not be injurious to the community'] to one that requires compensation whenever the state asserts its power to enforce it."  Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470, 492 (1987) (quoting Mugler v. Kansas, 123 U.S. 623, 665 (1887)).

On balance, the Court finds that Defendants' need to effectively and quickly respond to the COVID-19 pandemic by promulgating the July 8, 2020 Closure Order outweighs any other considerations warranting a finding that the Order amounts to a taking.  Thus, Plaintiffs are unlikely to succeed on the merits of their takings claim.

    B.    *Whether the movant will suffer irreparable harm if the TRO is not issued*

Plaintiffs have demonstrated through their affidavits and testimony that they will suffer irreparable harm if the TRO is not issued and the COVID-19 Orders remain in effect.

All testified that their businesses are closed as a result of the Order. Some of the Plaintiffs, if not all, will have to close their businesses for good if the Order remains in place for a protracted period. Plaintiffs testified at the Hearing that they cannot viably operate a curbside pickup or take-out business as allowed by the Closure Order. Operating in that manner would only increase these losses (they cannot cover the required operating costs) and hasten their demise. None of the Plaintiffs testified that they have been able to take part in either federal or state programs to alleviate the effects of the COVID-19 pandemic. The record is uncontroverted that Plaintiffs will suffer devastating economic injury if the Closure Orders remain in effect. This factor weights in favor of Plaintiffs.

  C. *Whether the issuance of the TRO would cause substantial harm to others and whether the public interest would be served by granting the TRO*

Enjoining enforcement of the Health Department's COVID-19 Closure Orders would likely cause substantial harm to other members of the community and would not be in the public interest. Preventing Defendants from enforcing the Order would present a risk of serious public harm and foster the continued spread COVID-19 virus by allowing the Plaintiff limited service restaurants to remain open.

The Court is not in the best position to make public health decisions. Nor is the Court tasked with making these decisions. It is the Shelby County Health Department's role to decide whether public health would be best served by the continued closure of each category of bars and restaurants in Shelby County, Tennessee. See Whitmer, 2020 WL 3468281, at *4 ("The decision to impose [costs related to a government's pandemic response] rests with the political branches of government . . . ."); see also Talleywhacker, Inc. v. Cooper, --- F. Supp.

3d ----, 2020 WL 3051207, at *14 (E.D.N.C. June 8, 2020) ("[W]here defendant has taken intricate steps to craft reopening policies to balance the public health and economic issues associated with the COVID-19 pandemic, while recognizing the continued severe risks associated with reopening, and where neither the court nor plaintiffs are better positioned to second-guess those determinations, the public interest does not weigh in favor of injunctive relief.").

The Court recognizes the burden that the Closure Order places on Plaintiffs' businesses. The Sixth Circuit recently discussed the issue in <u>Independent League of Fitness Facilities and Trainers, Inc. v. Whitmer</u>:

> We sympathize deeply with the business owners and their patrons affected by the Governor's Order. Crises like COVID-19 can call for quick, decisive measures to save lives. Yet those measures can have extreme costs—costs that often are not borne evenly. The decision to impose those costs rests with the political branches of government, in this case, Governor Whitmer.

2020 WL 3468281, at *4. The decision to impose extreme costs on Plaintiffs in the name of public health rests in the hands of Defendants. As such, the costs imposed on Plaintiffs by the local government's Closure Order can only be remedied by local government through its executive and legislative branches. It is not a matter for the Court.

On balance, the Court finds that three of the four factors of the TRO analysis weigh against granting the TRO. Given that Plaintiffs are unlikely to succeed on the merits of their constitutional claims and given the potential public health consequences of allowing Plaintiffs to continue to operate their businesses unfettered by Shelby County Government public safety and health regulations, the issuance of a TRO preventing the enforcement of the COVID-19 Closure Order is not appropriate in this case. The Court must therefore deny the Motion.

## IV.    CONCLUSION

For the reasons set forth above, Plaintiffs' Motion for a Temporary Restraining Order is **DENIED**.

**SO ORDERED**, this 29th day of July, 2020.

/s/ Jon P. McCalla<br>
JON P. McCALLA<br>
UNITED STATES DISTRICT JUDGE